Hillsborough,
No. 4997.

RICHARD G. CARRIGAN, *Adm'r v.* SACRED HEART HOSPITAL *& a.*

Argued December 5, 1961.

Decided March 6, 1962.

*James J. Kalled* (by brief and orally), for the plaintiff.

*Devine, Millimet & McDonough* (*Mr. Shane Devine* orally), for the defendant hospital.

*Sulloway, Hollis, Godfrey & Soden* and *Arthur W. Mudge II* (*Mr. Mudge* orally), for the defendant Wlodkoski.

DUNCAN, J. The primary issue is whether upon all the evidence considered most favorably to the plaintiff verdicts for the plaintiff could reasonably be returned. *Sargent* v. *Alton,* 102 N. H. 476; *Leonard* v. *Manchester,* 96 N. H. 115. The standard by which the conduct of the defendants is to be judged is neither doubtful nor disputed. They were required to possess the knowledge and to exercise the care and skill of the ordinary hospital or practitioner in the same or similar localities. *Michael* v. *Roberts,* 91 N. H. 499, 501. See *April* v. *Peront,* 88 N. H. 309, 311; *Garfield Memorial Hospital* v. *Marshall,* 204 F. 2d 721 (D. C. Cir. 1952).

Mrs. Carrigan, a woman of fifty-five years of age, entered the defendant hospital on August 24, 1956, suffering from high blood pressure and arthritis, and complaining of head and chest pains. The defendant Wlodkoski, a general practitioner, had been her attending physician for some years. He began treating her for rheumatoid arthritis in the late 1940's. In 1950 he saw her through a tonsillectomy and a hysterectomy. In 1954 she began to suffer from high blood pressure. On May 2, 1954 she was invalided by a stroke which paralyzed her left side, but from which she was able to make a partial recovery. Dr. Wlodkoski was her attending physician during all of this period. The evidence was that for several years, and particularly after her stroke, Mrs. Carrigan complained of pain in the region of her left hip which was attributed by Dr. Wlodkoski to her arthritis and to neuritis.

Following her admission to the defendant hospital on August 24, 1956, Mrs. Carrigan was restless and at times confused, and continued to complain of head and chest pains. On August 27, bedrails were placed on her bed, following which she became noisy and was reported to be disturbing other patients. The hospital records stated that on the afternoon of August 28 she was upset because of the bedrails, a fact confirmed by the testimony. On the same afternoon she was transferred to a private room, and private duty nurses were provided. The evidence indicated that thereafter she was more cheerful and less confused.

The bedrails were removed on orders of Dr. Wlodkoski given by telephone on either August 28 or August 29, following complaint that they were disturbing to the patient. The private duty nurses were discontinued by the plaintiff Carrigan on August 29 after the bedrails had been removed. At 4:30 A. M. on August 30, 1956, the nurses on duty heard Mrs. Carrigan fall and found her on the floor of her room. She testified on deposition that she fell while getting out of bed to go to the bathroom.

Mrs. Carrigan immediately complained of pain in her left hip and leg and was at once referred by Dr. Wlodkoski to Dr. Hagerty and Dr. Macek, both specialists in orthopedics, under whose supervision X-rays were taken. The plates were examined by these specialists and by Dr. Hasserjian, an X-ray specialist associated with Dr. Loverud who was under an agreement to furnish services in interpreting X-rays for the hospital.

The X-rays disclosed a fracture of the left side of the pelvis, but a fracture of the hip or upper femur was not detected. Dr.

Hagerty and Dr. Macek continued to treat Mrs. Carrigan until her release from the hospital to the home of a daughter on September 23, 1956. While in the hospital she was encouraged to move to a chair and to walk with the aid of a walker. After leaving the hospital however, she remained in bed and continued to complain of pain in her left hip.

Dr. Wlodkoski testified that he advised Mrs. Carrigan on January 27, 1957 to see Dr. Hagerty or some other orthopedic surgeon for further X-rays. Mrs. Carrigan's daughter, however, testified that she had no knowledge of this. When the same recommendation was made in May 1957, it was followed and Mrs. Carrigan consulted Dr. Rix, another orthopedist. X-rays were taken in another hospital in Manchester on May 8, 1957 which disclosed an un-united fracture of the neck of the left femur, the neck having been absorbed, with resulting displacement of the shaft. Operation upon the hip was advised against by Dr. Rix, because of "the situation of the fracture on the paralyzed side and . . . her general condition."

Some two weeks after her discharge from the hospital Mrs. Carrigan returned for treatment of a gall bladder ailment, and of her chronic arthritis and high blood pressure. She returned a second time for further treatment in December 1957, remaining there into January 1958. In June 1958, she entered a Boston hospital for consideration of possible hip surgery which was in fact performed. Her death occurred at this hospital on June 30, 1958.

In support of his exceptions to the orders of nonsuit in these cases, the plaintiff relies primarily upon alleged negligence on the part of both defendants in permitting the use of bedrails to be discontinued at a time when private duty nurses were no longer in attendance, and in failing to discover the fracture of the femur following Mrs. Carrigan's fall on August 30, 1956. Additionally, in the actions against the defendant Wlodkoski the plaintiff relies upon the defendant's alleged failure to take appropriate action before May 8, 1957 to discover the fracture which caused Mrs. Carrigan's continued pain in the area of her hip. While numerous other alleged shortcomings on the part of the defendants, and in particular the hospital, are relied upon, the major issues to which briefs and arguments have been devoted are those stated.

The evidence concerning the discontinuance of bedrails was undisputed except in one particular. The defendant physician testified that he had ordered the bedrails removed on August 29,

1956 following advice from Mr. Carrigan that the special nurses were being discharged, and a request that the rails be removed because they annoyed the patient. The plaintiff however testified he made no such request. The plaintiff's evidence was that no bedrails were used after Mrs. Carrigan was transferred to the private room on the afternoon of August 28.

It was not disputed that the private duty nurses were relieved from duty by the plaintiff at 11 P. M. on August 29, to the knowledge of the supervising nurse then on duty, and that Dr. Wlodkoski had previously by telephone ordered the bedrails removed by the hospital. The hospital record indicated that Dr. Wlodkoski visited the patient in the forenoon and afternoon of August 28, 1956 and the forenoon and early evening of August 29. He testified that when he ordered the bedrails removed he was aware that the special nurses were being relieved from duty.

The defendants argue, and we agree, that the question of whether the welfare of this patient required that the bedrails be retained over her protest or complaints, called for the exercise of the expert judgment of a physician. "By the overwhelming weight of authority including this state, the question of whether a physician uses ordinary care must depend upon expert testimony." *Beane* v. *Perley*, 99 N. H. 309, 310. See also, *April* v. *Peront*, 88 N. H. 309. There was no evidence presented upon which the defendant physician could reasonably be found negligent in ordering the bedrails removed. "This was a question upon which the uninformed judgment of the jury was worthless and expert testimony was essential." *Michael* v. *Roberts, supra,* 91 N. H. 499, 501. See *Grace* v. *Manhattan Eye, Ear & Throat Hospital,* 301 N. Y. 660, 661.

The evidence likewise discloses no reason to attribute negligence to the defendant hospital in following the order of the attending physician, or in failing to seek to have it modified. The plaintiff contends that, construing the evidence most favorably to him, the jury could find that the order to remove the rails was given on August 28, since there was evidence that they were not used after the patient was transferred to a private room on that date; that arrangements to dismiss the special duty nurses were not made until the evening of the 29th; that this fact was not made known to Dr. Wlodkoski or to the supervisor who went on duty at 11:00 P. M. on the 29th; and that due care required that the hospital resume use of the bedrails after that hour, in view of the absence of the

special nurses, and the fact that one of two regular floor nurses did not report for duty at 11:00 P. M.

The evidence was that the supervisor reporting at 11:00 P. M. was told of the order for removal of the rails, but not of the discontinuance of the private nurses; that the floor nurse on duty checked on Mrs. Carrigan at least four times between 11:00 P. M. and 4:30 A. M. when she fell; and that "just before the accident" Mrs. Carrigan was found to be "sleeping soundly." The absence both of the rails and of the special nurses was known to the nurse on duty, but there was no evidence that the patient's condition was such as to call for the use of bedrails, or to give rise to any occasion to question the orders of her physician. Some risk of a fall from bed presumably exists with any patient. The evidence indicated that physical restraint of a patient is often undesirable, that bedrails are not always effective even when used, and that "each patient problem of this type has to be appraised on its own characteristics, and a procedure decided upon."

In this case, the procedure to be followed was determined by the attending physician. The circumstances which existed on August 29 and 30 could not be found to warrant disregard of his order by nurses in the employ of the defendant hospital. See *Pivar* v. *Manhattan General*, 279 N. Y. App. Div. 522, 525; *Minogue* v. *Rutland Hospital*, 119 Vt. 336, 339-340. Neither could it be found that due care required the hospital to seek a change in the order.

The plaintiff charges that the hospital was negligent in failing to provide either a larger number of floor nurses than were available on August 30, or closer supervision of the patient. While there was evidence that the rules of the hospital provided for two staff nurses rather than one at the time of the accident, there was no evidence that the absence of a second nurse was capable of remedy before the accident occurred, or that an additional nurse on duty would or could have prevented Mrs. Carrigan's fall. Due care did not require that the nurse on duty devote her time to watching a sleeping patient. The patient's bed was equipped with a call button, and there was no reason to anticipate that she would undertake to leave her bed, or that she was likely to fall from it if rails were not provided. Whether the order for removal of the rails was given on August 28 or August 29, the evidence did not permit a finding of causal negligence on the part of the hospital.

One of the plaintiff's daughters, who was a registered nurse with experience limited, so far as appeared, to practice in the defendant

hospital, was permitted to testify over objection that in her opinion "the failure to place the side boards back on to [the] bed at 11:00 P. M. on August 29, 1956 [was] an act that is below the standard of care for hospitals and nurses in the community of Manchester, New Hampshire then existing." This expression of opinion alone could not entitle the plaintiff to go to the jury. Neither the question nor the witness' answer took into account the order of the attending physician for removal of the rails. There was no claim that the training of the witness in any way qualified her to express an opinion that the physician was negligent in giving the order, and no showing that the standard of care exercised by hospitals in Manchester required the use of bedrails in all cases where nurses were not in constant attendance, whatever the condition of the patients or the orders of the attending physicians might be. The issue with respect to the use of bedrails was properly withdrawn from the jury. *Potter* v. *Grover Latter-Day Saints Hospital,* 99 Utah 71. See Annot. 31 A. L. R. 2d 1128.

On the issue relating to the failure of the defendants to discover the fracture of the femur immediately after the fall, there was likewise no evidence which would permit a finding of failure to exercise the requisite care and skill. X-rays were taken under the direct supervision of the two orthopedic consultants. The plates were examined by them and interpreted by Dr. Hasserjian. If the fracture was undiscovered because of negligence on their part, a finding which could not be made on the record, the defendants were not chargeable therewith. *Shannon* v. *Ramsey,* 288 Mass. 543, 551. While the plaintiff suggests that Dr. Hasserjian may have been an agent of the hospital for whose conduct it should be held responsible, the evidence failed to support this view. *Welch* v. *Hospital,* 90 N. H. 337.

The remaining issue relates to the failure of the defendant physician to cause the fracture of the femur to be discovered prior to May 8, 1957. There was no evidence on which the defendants could be found negligent in not doing so prior to Mrs. Carrigan's discharge from the hospital on September 23, 1956, during which time she was under the care of the orthopedic specialists. Dr. Hasserjian testified that additional X-ray plates taken immediately after the accident would not have provided "any more information," and that the only way the fracture could have been discovered was by waiting and taking later X-rays. Any external or clinical symptoms of the fracture were consistent with other ailments from which the patient was known to be suffering.

The defendant Wlodkoski testified that he advised further X-rays on January 27, 1957 by which time the pelvic fracture should have healed. It is conceded however, that if his disputed testimony that he then advised further X-rays were disbelieved and in fact they were not advised until May of 1957, a finding of negligence on his part would be warranted on the basis of his own testimony. The vital issue then becomes one of causation.

In order for the jury to find the defendant liable, evidence that a better result could have been achieved by discovery of the fracture in the previous February or March was an essential prerequisite. The plaintiff furnished no evidence that discovery of the fracture between January and May 1957 would or could have resulted in any different or more successful course of treatment. Dr. Rix, who discovered the fracture in May 1957, testified that he did not believe he would have diagnosed the fracture from the original X-ray, and that his recommendation at the time of the accident "in her particular case [would have been] a continuation of the same care that she had been getting which consisted of bed rest with occasional transfer to a chair." When the fracture was discovered on May 8, 1957, Dr. Rix advised in the light of Mrs. Carrigan's general condition that "nothing could be done surgically to help her." Neither he nor any other witness testified that any different course of treatment would have been possible if the fracture had been discovered as soon as reasonable care dictated the taking of further X-rays.

The speed with which the neck of the fractured femur probably became absorbed remained an unknown factor. The only evidence which bore upon the advisability of surgery at any time was Dr. Rix' testimony that he advised against it in May, and Dr. Wlodkoski's testimony that Mrs. Carrigan was not a good operative risk at any time after her fall. If this testimony were disbelieved, such disbelief would not warrant an affirmative finding to the contrary. *Bissonnette* v. *Cormier,* 100 N. H. 197, 199.

If the plaintiff correctly argues that he should be entitled to damages for any loss of Mrs. Carrigan's "right to the chance for better results" (*Burk* v. *Foster,* 114 Ky. 20, 26) it was necessary first that he should establish that she had such a chance. On the record before us, where the expert testimony was limited to that previously described, the jury could not so find. In consequence the orders for nonsuit were properly entered. *Kuhn* v. *Banker,* 133 Ohio St. 304; *Cyr* v. *Giesen,* 150 Me. 248; *Hurley* v. *Johnston,* 143

Conn. 364, 367; *Coakley* v. *Hayes*, 121 Colo. 303. See Annots. 13 A. L. R. 2d 11, 112; 54 A. L. R. 2d 200, 221; 54 A. L. R. 2d 273, 285, 308.

The plaintiff's exceptions to evidentiary rulings by the Trial Court have been reviewed and no error is perceived in the rulings.

*Exceptions overruled.*

All concurred.