Belknap
No. 99-179

BELINDA JOYCE LORD

v.

JAMES LOVETT, M.D. & a.

April 4, 2001

*McKean, Mattson & Latici, P.A.*, of Gilford (*Edgar D. McKean, III* on the brief and orally), for the plaintiff.

*Ransmeier & Spellman, P.C.*, of Concord (*Lawrence S. Smith* and *John T. Alexander* on the brief, and *Mr. Alexander* orally), for defendant James Lovett, M.D.

*Wadleigh, Starr & Peters, P.L.L.C.*, of Manchester (*Ronald J. Lajoie* and *Todd Hathaway* on the brief, and *Mr. Lajoie* orally), for defendant Samuel Aldridge, M.D.

*Sulloway & Hollis, P.L.L.C.*, of Concord (*Martin L. Gross* and *Sarah S. Murdough* on the brief), for New Hampshire Medical Society, as *amicus curiae*.

NADEAU, J. The plaintiff, Belinda Joyce Lord, appeals the Superior Court's (*Perkins*, J.) dismissal of her "loss of opportunity" action against the defendants, James Lovett, M.D., and Samuel Aldridge, M.D. We reverse and remand.

The plaintiff suffered a broken neck in an automobile accident on July 22, 1996, and was treated at the Lakes Region General Hospital by the defendants. She contends that because the defendants negligently misdiagnosed her spinal cord injury, they failed both to immobilize her properly and to administer steroid therapy, causing her to lose the opportunity for a substantially better recovery. She

alleges that she continues to suffer significant residual paralysis, weakness and sensitivity.

Upon learning that the defendants intended to move to dismiss at the close of the plaintiff's case, the trial court permitted the plaintiff to make a pre-trial offer of proof. She proffered that her expert would testify that the defendants' negligence deprived her of the opportunity for a substantially better recovery. She conceded, however, that her expert could not quantify the degree to which she was deprived of a better recovery by their negligence.

Following the plaintiff's offer of proof, the defendants moved to dismiss on two grounds: (1) New Hampshire law does not recognize the loss of opportunity theory of recovery; and (2) the plaintiff failed to set forth sufficient evidence of causation. The trial court dismissed the plaintiff's action on the basis that her case is "clearly predicated on loss of . . . opportunity" and that "there's no such theory permitted in this State." This appeal followed.

When reviewing a motion to dismiss on appeal, we accept as true the plaintiff's allegations of fact and ask whether they "are reasonably susceptible of a construction that would permit recovery." *Konefal v. Hollis/Brookline Coop. School Dist.*, 143 N.H. 256, 258 (1998) (quotation omitted).

■ The loss of opportunity doctrine, in its many forms, is a medical malpractice form of recovery which allows a plaintiff, whose preexisting injury or illness is aggravated by the alleged negligence of a physician or health care worker, to recover for her lost opportunity to obtain a better degree of recovery. *See Delaney v. Cade*, 873 P.2d 175, 178 (Kan. 1994); King, *"Reduction of Likelihood" Reformulation and Other Retrofitting of the Loss-of-a-Chance Doctrine*, 28 U. MEM. L. REV. 491, 492-93 (1998).

Generally, courts have taken three approaches to loss of opportunity claims.

The first approach, the traditional tort approach, is followed by a minority of courts. *See* Comment, *The Loss of Chance Doctrine: A Small Price to Pay for Human Life*, 42 S.D. L. REV. 279, 293-95 (1997). According to this approach, a plaintiff must prove that as a result of the defendant's negligence, the plaintiff was deprived of at least a fifty-one percent chance of a more favorable outcome than she actually received. *See* King, *"Reduction of Likelihood" Reformulation, supra* at 506. Once the plaintiff meets this burden, she may recover damages for the entire preexisting illness or condition. *See* King, *"Reduction of Likelihood" Reformulation, supra.*

Under this approach, a patient whose injury is negligently misdiagnosed, but who would have had only a fifty percent chance of

full recovery from her condition with proper diagnosis, could not recover damages because she would be unable to prove that, absent the physician's negligence, her chance of a better recovery was at least fifty-one percent. *See* King, *"Reduction of Likelihood" Reformulation, supra.* If, however, the patient could establish the necessary causal link by establishing that absent the negligence she would have had at least a fifty-one percent chance of a better outcome, not only would the patient be entitled to recover, but she would be awarded damages for her entire injury. *See* King, *"Reduction of Likelihood" Reformulation, supra.* This approach has been criticized as yielding an "all or nothing" result. *See* King, *"Reduction of Likelihood" Reformulation, supra; Delaney,* 873 P.2d at 183.

The second approach, a variation of the traditional approach, relaxes the standard of proof of causation. The causation requirement is relaxed by permitting plaintiffs to submit their cases to the jury upon demonstrating that a defendant's negligence more likely than not "increased the harm" to the plaintiff or "destroyed a substantial possibility" of achieving a more favorable outcome. *See* King, *"Reduction of Likelihood" Reformulation, supra* at 507.

Under this approach, the patient would not be precluded from recovering simply because her chance of a better recovery was less than fifty-one percent, so long as she could prove that the defendant's negligence increased her harm to some degree. *See* King, *"Reduction of Likelihood" Reformulation, supra.* The precise degree required varies by jurisdiction. Some courts require that the defendant's negligence increase the plaintiff's harm by any degree, while other courts require that the increase be substantial. *See Delaney,* 873 P.2d at 184-85. As in the traditional approach, once the plaintiff meets her burden, she recovers damages for the entire underlying preexisting condition or illness rather than simply the loss of opportunity. *See* King, *"Reduction of Likelihood" Reformulation, supra.* This approach "represents the worst of both worlds [because it] continues the arbitrariness of the all-or-nothing rule, but by relaxing the proof requirements, it increases the likelihood that a plaintiff will be able to convince a jury to award full damages." King, *"Reduction of Likelihood" Reformulation, supra* at 508.

Under the third approach, the lost opportunity for a better outcome is, itself, the injury for which the negligently injured person may recover. *See* King, *"Reduction of Likelihood" Reformulation, supra.* As with the second approach, a plaintiff may prevail even if her chances of a better recovery are less than fifty-one percent. *See* King, *"Reduction of Likelihood" Reformulation, su-*

*pra.* The plaintiff, however, does not receive damages for the *entire* injury, but just for the lost opportunity.

In other words, if the plaintiff can establish the causal link between the defendant's negligence and the lost opportunity, the plaintiff may recover that portion of damages actually attributable to the defendant's negligence. *See* King, *"Reduction of Likelihood" Reformulation, supra* at 509.

Under this approach, "[b]y defining the injury as the loss of chance . . . , the traditional rule of preponderance is fully satisfied." *Perez v. Las Vegas Medical Center*, 805 P.2d 589, 592 (Nev. 1991).

We agree with the majority of courts rejecting the traditional "all-or-nothing" approach to loss of opportunity cases, and find the third approach most sound. *See Delaney*, 873 P.2d at 184-86; *Perez*, 805 P.2d at 591-93. The third approach permits plaintiffs to recover for the loss of an opportunity for a better outcome, an interest that we agree should be compensable, while providing for the proper valuation of such an interest.

> [T]he loss of a chance of achieving a favorable outcome or of avoiding an adverse consequence should be compensable and should be valued appropriately, rather than treated as an all-or-nothing proposition. Preexisting conditions must, of course, be taken into account in valuing the interest destroyed. When those preexisting conditions have not absolutely preordained an adverse outcome, however, the chance of avoiding it should be appropriately compensated even if that chance is not better than even.

King, *Causation, Valuation, and Chance in Personal Injury Torts Involving Preexisting Conditions and Future Consequences*, 90 YALE L.J. 1353, 1354 (1981).

■ Accordingly, we hold that a plaintiff may recover for a loss of opportunity injury in medical malpractice cases when the defendant's alleged negligence aggravates the plaintiff's preexisting injury such that it deprives the plaintiff of a *substantially* better outcome. *See Delaney*, 873 P.2d at 178, 185-86; *see also Perez*, 805 P.2d at 592.

The defendants argue that RSA chapter 507-E precludes us from adopting the lost chance doctrine. They first argue that RSA chapter 507-E defines the types of harm for which a plaintiff may recover and does not include loss of opportunity. We disagree.

RSA 507-E:1 defines "medical injury" as

> any adverse, untoward or undesired consequences arising out of or sustained in the course of professional services rendered by a medical care provider, whether resulting from negligence, error, or omission in the performance of such services; . . . from failure to diagnose; . . . or otherwise arising out of or sustained in the course of such services.

RSA 507-E:1, III (1997).

■ The plaintiff's loss of opportunity injury is an adverse or unintended consequence resulting from the defendants' negligence, error, omission, or failure to diagnose. *See* RSA 507-E:1. Nothing in the statute's plain language precludes us from recognizing this right of recovery. We recognize the right based not upon an "expansive" reading of the statute or a "generous" interpretation of medical injury, but rather, upon a strict application of statutory construction and well-established tort principles to a claim which we confront directly for the first time. We do not drag it from the shadows of the common law but draw it from the light of the legislative enactment.

Nor do we need to consider the legislative history of RSA chapter 507-E since, on its face, the statute does not preclude recovery for the plaintiff's injury. When the language of a statute is clear, it is not necessary to agonize over ambiguous and often conflicting legislative history. "While legislative history may be helpful in the interpretation of an ambiguous statute, it will not be consulted when the statutory language is plain." *Appeal of Cote*, 144 N.H. 126, 129 (1999) (quotation omitted).

The importance of this principle of statutory construction is demonstrated by the misplaced reliance the concurrence places upon the statement of Attorney Martin Gross that, "Th[is] section invents nothing new nor does it open any doors," cited to elucidate the definition of "medical injury" in RSA chapter 507-E. HOUSE COMMITTEE ON HEALTH AND WELFARE HEARING ON HB 314 (March 9, 1977) (Summary of testimony of Martin L. Gross, Special Counsel to the New Hampshire Medical Society). Significantly, that statement is immediately preceded by Gross' statement that, "Here the definition is drawn so as to cover all conceivable lawsuits against medical care providers." *Id.* Surely this lawsuit meets that definition.

We also note that we are not called upon, today, to consider the interaction of two separate statutes as we were in *Nault v. N & L Development Co.*, 146 N.H. 35 (2001), but rather to determine

whether an important substantive right to recover for the injury of lost opportunity is encompassed by one statute. Clearly, it is.

The defendants imply that the loss of opportunity doctrine is contrary to the burden of proof requirements described in RSA 507-E:2 (1997). Specifically, the defendants argue that the loss of opportunity doctrine permits recovery based on the "possibility" that the defendant caused the plaintiff's injury, whereas RSA 507-E:2 requires the plaintiff to establish that the alleged negligence "probably" caused the injury.

RSA 507-E:2 provides:

I. In any action for medical injury, the plaintiff shall have the burden of proving by affirmative evidence which must include expert testimony of a competent witness or witnesses:

. . . .

(c) That as a proximate result thereof, the injured person suffered injuries which would not otherwise have occurred.

RSA 507-E:2.

█ We disagree that the loss of opportunity doctrine is inconsistent with RSA 507-E:2, I(c). By recognizing loss of opportunity as a cognizable injury, we refute the notion that the plaintiff would be unable to prove that the defendants' negligence "probably" caused her to suffer "injuries which would not otherwise have occurred." The right we recognize today still requires a plaintiff to prove that the injury she suffered — the lost opportunity for a better outcome — was caused, more probably than not, by the defendant's negligence.

The defendants next argue that we rejected the loss of opportunity doctrine in *Pillsbury-Flood v. Portsmouth Hospital*, 128 N.H. 299 (1986), and *Bronson v. The Hitchcock Clinic*, 140 N.H. 798 (1996). We disagree.

To support their argument, the defendants rely on dicta in *Pillsbury-Flood* in which we stated that relaxing the plaintiff's causation requirement is "ill-advised." *See Pillsbury-Flood*, 128 N.H. at 304-05. We are not required, however, to give to dicta "the deference accorded by *stare decisis* to actual holdings." *In re Estate of Norton*, 135 N.H. 62, 64 (1991) (citation omitted).

Moreover, the doctrine we disapproved in *Pillsbury-Flood* was not the doctrine we recognize today. *See Pillsbury-Flood*, 128 N.H. at 301. In that case, the plaintiff, alleging that the defendants'

negligent failure to diagnose her husband's head injury caused his death, urged us to shift the burden to prove causation to the defendants. That request was rejected. *See id.* at 304. That holding is not altered by our decision today.

The defendants also argue that in *Bronson v. The Hitchcock Clinic*, we affirmed the holding of *Pillsbury-Flood*. In *Bronson*, the plaintiff brought a negligence action against the defendant for the death of his wife, alleging that the defendant misdiagnosed his wife's Hodgkin's disease. *See Bronson*, 140 N.H. at 799-800. On appeal, the defendant argued that the trial court erred in denying its motions for directed verdict and for judgment notwithstanding the verdict because the plaintiff failed to introduce sufficient evidence of causation. *See id.*

In affirming the trial court, without making any reference to the loss of opportunity doctrine, we held that "[t]he plaintiff must produce evidence sufficient to warrant a reasonable juror's conclusion that the causal link between the negligence and the injury probably existed." *Id.* at 801. The defendants argue that this language precludes the plaintiff's claim. We disagree. Having alleged as her injury the loss of opportunity, the plaintiff is not relieved of her burden to prove that the defendants' negligence "probably" caused it.

█ Finally, defendant Lovett argues that we should not recognize the plaintiff's loss of opportunity injury because it is intangible and, thus, is not amenable to damages calculation. We disagree.

First, we fail to see the logic in denying an injured plaintiff recovery against a physician for the lost opportunity of a better outcome on the basis that the alleged injury is too difficult to calculate, when the physician's own conduct has caused the difficulty. *See Hicks v. United States*, 368 F.2d 626, 632 (4th Cir. 1966). Second, "[w]e have long held that difficulty in calculating damages is not a sufficient reason to deny recovery to an injured party." *Smith v. Cote*, 128 N.H. 231, 242 (1986). Third, loss of opportunity is not inherently unquantifiable. A loss of opportunity plaintiff must provide the jury with a basis upon which to distinguish that portion of his or her injury caused by the defendant's negligence from the portion resulting from the underlying injury. *See Valliere v. Filfalt*, 110 N.H. 331, 332-33 (1970); King, *Causation, Valuation, and Chance, supra* at 1360. This can be done through expert testimony just as it is in aggravation of pre-existing injury cases.

We decline to address the defendants' arguments disputing the sufficiency of the plaintiff's evidence because the trial court has not

yet considered the issue. The trial court limited its ruling to the legal question of whether New Hampshire recognizes the loss of opportunity doctrine. We likewise limit our holding to that question.

The defendants' remaining arguments are without merit and do not warrant further discussion. *See Vogel v. Vogel*, 137 N.H. 321, 322 (1993).

*Reversed and remanded.*

BRODERICK, J., concurred specially; DALIANIS, J., concurred; GROFF and MANGONES, JJ., superior court justices, specially assigned under RSA 490:3, concurred.

BRODERICK, J., concurring specially. I agree with the majority's holding that RSA 507-E:1, III is broad enough to encompass the loss of chance doctrine, adopted today by the court, but I do so with reservation. The cause of action for loss of chance, which we articulate today, previously resided in the shadows of the common law in this State and has never before been explicitly sanctioned in our jurisprudence. Its adoption today ironically springs from a statute passed in 1986 as part of comprehensive tort reform, which was intended to preempt the common law and bring predictability and stability to the insurance market, in part, for the benefit of health care providers.

It is well established that we do not construe a statute in isolation, but, instead, attempt to do so in harmony with the scheme under which the law was enacted. *See Nault v. N & L Development Co.*, 146 N.H. 35, 37 (2001) ("In construing statutory language, we examine the language not in isolation, but in the context of the overall statutory scheme." (quotation and brackets omitted)); *State v. Farrow*, 140 N.H. 473, 475 (1995) ("We begin our analysis by examining the [statute's] purpose and effect . . . ."); *Chagnon v. Union-Leader Co.*, 104 N.H. 472, 476 (1963) ("In interpreting the law, we are bound to be mindful of its apparent purpose, as disclosed by its language in light of its legislative history."); *see also Claremont School Dist. v. Governor (motion to vacate)*, 142 N.H. 737, 739 (1998).

The tangled history of the 1986 tort reform includes five bills and much debate. The language of RSA 507-E:1, III, which defines "medical injury," remained the same throughout numerous drafts and, in fact, is identical to RSA 507-C:1, III (Supp. 1979), a predecessor statute which was declared unconstitutional on other grounds in 1980. *See Carson v. Maurer*, 120 N.H. 925, 945-46 (1980).

In enacting tort reform in 1986, the legislature was concerned about the "very real and very difficult current problem — the availability and affordability of liability insurance for . . . New Hampshire . . . professional people." N.H.S. JOUR. 190 (1986). In a statement to his colleagues, Senator Blaisdell summarized the issue underlying the call for tort reform: "[T]he basic underlying problem is that as tort liability [ha]s expanded, the risk of insuring that liability has increased and has become more unpredictable. . . . The basic underlying problem, the tort law itself, has to be stabilized, has to be made more predictable and has to have the excesses trimmed from it." *Id.* at 192. In the medical malpractice area, it is clear that the reform was aimed at limiting the "higher price tags" of verdicts, which, in turn, were seen as the cause of higher insurance premiums and rates. *Id.* at 190. Senator Bartlett expressed his support for the reform, saying, "If we continue to allow lawsuits to run [court awards and settlement amounts] up, we're going to have an awful problem in this State." *Id.* at 815.

The legislature's concerns, which motivated the 1986 tort reform, appear to have been the same concerns which prompted legislative action seven years earlier when RSA chapter 507-C was enacted as part of another attempt at tort reform. In passing RSA chapter 507-C, the legislature

> set forth rigorous standards for qualified expert testimony, created a two-year statute of limitations applicable to most medical malpractice actions, required that notice of intent to sue be given at least sixty days before commencing the action, prohibited the statement of the total damages claimed as an ad damnum or otherwise, abolished the collateral source rule, limited the amount of damages recoverable for non-economic loss to $250,000, empowered the court to order periodic payments of any future damages in excess of $50,000, and established a contingent fee scale for attorneys in medical malpractice actions.

*Carson*, 120 N.H. at 930. The legislature's purpose was "to contain the costs of the medical injury reparations system by revising and codifying the applicable tort law." *Id.* In its statement of findings and purposes, the legislature concluded

> that substantial increases in the incidence and size of claims for medical injury pose a major threat to effective delivery of medical care in the state and that the risks and consequences of medical injury must be stabilized in order to

> encourage continued provision of medical care to the public at reasonable cost, the continued existence of medical care institutions and the continued readiness of individuals to enter the medical care field.

*Id.* (quotations omitted). Clearly, RSA chapter 507-C was intended to "codify and stabilize the law governing medical malpractice actions and to improve the availability of adequate liability insurance for health care providers at reasonable cost." *Id.* Because several of the statute's key provisions were declared unconstitutional and could not be separated from the remainder of the statute, the entire chapter was declared void. *Id.* at 945-46.

RSA chapter 507-E, its successor, eliminated the constitutionally infirm provisions of RSA chapter 507-C, while retaining others that had passed constitutional muster. Notably, the definition of "medical injury" remained unchanged. *See* RSA 507-E:1, III; RSA 507-C:1, III. It is unclear, given the rigors and onerous restrictions of RSA chapter 507-C, whether the definition of "medical injury" should be read as expansively as this court has chosen to read it under RSA 507-E:1, III. It may well be that the legislature, in enacting RSA chapter 507-E, did no more than codify the then recognized common law causes of action for medical malpractice in New Hampshire and subject them to uniform and more rigorous standards. *See* HOUSE COMMITTEE ON HEALTH AND WELFARE HEARING ON HB 314 (March 9, 1977) (Summary of testimony of Martin L. Gross, Special Counsel to the New Hampshire Medical Society) ("This section invents nothing new nor does it open any doors."). If so, then an expansive reading of RSA 507-E:1, III to include loss of chance as an injury would not be warranted. On the other hand, if the legislature intended to cast a wide net to capture any possible claims of medical malpractice, whether or not then recognized in the common law of this jurisdiction, then the definition of "medical injury" provided in RSA 507-E:1, III most certainly should be read to incorporate loss of chance. *See id.* ("[T]he definition [of medical injury was] drawn so as to cover all conceivable lawsuits against medical care providers. . . . It [was] drafted in an attempt to see that *all cases* against medical care providers will be covered by the rules laid down later in this Bill.").

Because it is not clear which route the legislature followed, I cannot disagree with the majority's generous interpretation of "medical injury." If the legislature believes that unintended consequences have beset its statutory definition, I would respectfully urge it to clarify the statute to remove any uncertainty.