4

Grafton
No. 88-086

*In re "K"*

July 14, 1989

*Nixon, Hall & Hess P.A.*, of Manchester (*Francis G. Murphy, Jr.*, and *David W. Hess* on the brief, and *Mr. Murphy* orally), for the petitioner.

*Orr & Reno P.A.*, of Concord (*Bradford W. Kuster* on the brief and orally), for the respondent, Dartmouth-Hitchcock Medical Center.

*Rath, Young, Pignatelli & Oyer P.A.*, of Concord (*Eve H. Oyer* on the brief), by brief for the New Hampshire Hospital Association, as *amicus curiae.*

*Sulloway Hollis & Soden*, of Concord (*Robert M. Larsen* on the brief), by brief for the New Hampshire Medical Society, as *amicus curiae.*

SOUTER, J. The Dartmouth-Hitchcock Medical Center appeals an order of the Superior Court (*Morrill*, J.) requiring Mary Hitchcock Memorial Hospital to provide a former patient with two documents, a report of the hospital's nurse epidemiologist and minutes of the hospital's Infections Committee, each addressing the possibility that the patient contracted herpes while in the hospital. We hold the report and minutes privileged against disclosure under RSA 151:13-a (Supp. 1988) and reverse.

The plaintiff, who has been designated by the letter "K" to preserve anonymity, was admitted to the maternity section of Mary Hitchcock Memorial Hospital in Hanover on August 2, 1986, and gave birth to a child the following day. On August 7, two days after her discharge, K experienced pain while urinating. Although a physician's examination revealed no more than redness where an episiotomy had been performed, blisters appeared in the genital area over the course of the next three days, and a second physician who examined K on August 12 said the blisters appeared to be

symptoms of herpes. A culture was then taken, as was another on August 14, after which the herpes infection was confirmed. K had not been so diagnosed previously.

K's husband happened to be employed by the hospital at the time and was sufficiently familiar with its organization to know that its nurse epidemiologist, Nancy Watkins, customarily made enquiries into the origins of infections that might arguably have been communicated within the hospital. Accordingly, on August 15, he met with Mrs. Watkins, told her about the diagnosis, and described three unsanitary conditions observed during K's hospital stay that he thought might be, or indicate, the source of her infection: a container of another patient's urine had been left in the lavatory K shared; insects had been found floating in a bath in which K had soaked to mitigate her labor pains; and ice packs used during the episiotomy had not, he suspected, been adequately cleaned. He later testified, subject to Mrs. Watkin's denial, that he asked whether another maternity patient during K's admission had been infected with herpes, K having told him about the suspiciously bandaged leg of a woman in a nearby room where K had attended a group discussion. K's husband also claimed, and Mrs. Watkins also denied, that he asked her to incorporate the results of her enquiry into the record of K's medical treatment.

Mrs. Watkins proceeded to conduct an investigation that included a test of K's blood, interviews with K's two treating physicians and the head of the maternity nursing unit, and an examination of K's medical record. In the meantime, one of K's treating physicians prescribed medication for the infection.

Although Mrs. Watkins testified that she had probably told K's husband that she would report back to him in some fashion, it was not her practice to make reports to patients and she decided against doing so in this case. She planned, instead, to advise one of K's treating physicians of anything that might appropriately be communicated to K, and otherwise to report only to the hospital's Infections Committee, as in the normal course. On August 29, 1986, however, K herself called Mrs. Watkins to ask what she had learned. K testified that Mrs. Watkins told her the hospital had admitted a patient with herpes during K's stay, but that the patient's symptomatic leg had been wrapped. Mrs. Watkins denied this and testified that, as a matter of courtesy, she told K she had determined that none of the three conditions mentioned by K's husband indicated a probable source of infection, and told her nothing else about the investigation. In any event, Mrs. Watkins thereafter reported her findings to the Infections Committee at its

September 1986 meeting, as reflected in its minutes, and prepared a written report, now retained in files kept in her own office.

In 1987, K's lawyer requested the hospital, through Mrs. Watkins, to release the results of the investigation. When the hospital claimed a privilege under RSA 151:13-a (Supp. 1988) and refused, K brought the instant petition in the superior court seeking a disclosure order. The superior court found the statute ambiguous and expressive of no clear legislative intent to create a privilege for the records of any hospital committee except one established to promote "quality assurance." Having found that the hospital had a quality assurance committee separate from the Infections Committee, the trial court held the privilege inapplicable and ordered disclosure of Mrs. Watkin's written report and the relevant portion of the minutes of the Infections Committee's September 1986 meeting. The hospital appealed.

The principal issue being the applicability of the statutory privilege to the documents in question, our first concern is with the words of the statute:

> "151:13-a   Proceedings of Hospital Committees; Confidentiality.

> "I. As used in this section 'records' means records of interviews and all reports, statements, minutes, memoranda, charts, statistics, and other documentation generated during the activities of a quality assurance committee. Records shall not mean original hospital medical records or other records kept relative to any patient in the course of the business of operating a hospital.

> "II. Records of a hospital committee organized to evaluate matters relating to the care and treatment of patients or to reduce morbidity and mortality and testimony by hospital trustees, medical staff, employees, or other committee attendees relating to activities of the quality assurance committee shall be confidential and privileged and shall be protected from direct or indirect means of discovery, subpoena, or admission into evidence in any judicial or administrative proceeding, except that in the case of a legal action brought by a quality assurance committee to revoke or restrict a physician's license or hospital staff privileges, or in a proceeding alleging repetitive malicious action and personal injury brought against a physician, a committee's records shall be discoverable.

"III. A hospital board of directors or trustees may waive its privilege under this section and release information or present committee records by discovery, subpoena, or admission into evidence in any judicial or administrative proceeding.

"IV. No hospital, trustees, medical staff, employees, or other committee attendees shall be held liable in any action for damages or other relief arising from the providing of information to a hospital committee or in any judicial or administrative proceeding."

Thus, subject to exceptions not relevant here, the provisions of paragraphs I and II create a privilege against disclosure of records "generated during the activities" of a hospital committee "organized to evaluate matters relating to the care and treatment of patients or to reduce morbidity and mortality," and paragraph II provides further for a privilege against evidentiary admissibility of the testimony, as such, of "committee attendees relating to activities of the quality assurance committee."

Although the statute's drafting is imprecise, we do not perceive any ambiguity as between the references to a "quality assurance committee" and a "hospital committee organized to evaluate . . . care . . . and reduce" risk. "Quality assurance committee" is not otherwise defined, and the objects of evaluating care and reducing risk would seem to be natural and reasonable concerns of any group charged with responsibility for quality assurance. Neither party before us argues otherwise, and we infer that the verbal differences between the subject matter description and the definition just quoted do not give rise to questions about statutory meaning.

Another feature of the statute's structure, however, does create at least an arguable basis for disagreement about its scope. Twice the statute speaks of "a quality assurance committee" (paragraphs I and II), once of "the quality assurance committee" (paragraph II), and once of "a hospital committee organized to evaluate matters relating to the care and treatment of patients or to reduce morbidity and mortality" (paragraph II). One may reasonably ask whether there is any significance in the mixture of definite and indefinite articles. Should the definite reference to "the quality assurance committee" in paragraph II be thought to imply that a given hospital is permitted to have only one such committee as a font of statutory privilege, or were the indefinite references to "a quality assurance committee" and "a hospital committee organized to evaluate . . ." meant to indicate that a hospital may have more than one, each identified by reference to its functional responsibility?

The plaintiff argues for the first view, the hospital for the second. We hold the second to be correct.

A search for the legislature's probable intent leads back to developments in hospital regulation that explain the statute's enactment. RSA 151:2 (Supp. 1988) and :5 (Supp. 1988) require hospitals to be licensed annually by the Division of Public Health Services of the State Department of Health and Human Services. In the discharge of its licensing responsibilities, the department relies heavily on a national voluntary organization known as the Joint Commission on Accreditation of Hospitals (joint, that is, among the American Medical Association, the American Hospital Association and three other professional organizations). *See* Jost, *The Joint Commission on Accreditation of Hospitals: Private Regulation of Health Care and the Public Interest*, 24 B.C.L. REV. 835, 840 (1983). Thus, the department's regulation He-P 802.12 provides that "[u]nder the authority of RSA 151:6-a, any general hospital which has been issued a certificate of accreditation by the Joint Commission on Accreditation of Hospitals (JCAH) shall fulfill the requirements for general hospital licensure." While this regulation does not in terms require accreditation by the Joint Commission as a condition of licensure, accreditation is a virtual necessity as the readiest avenue of eligibility for reimbursement of hospital charges under a number of insurance schemes such as Medicare. *See* Jost, *supra* at 840–43.

It was one of the Joint Commission's requirements for hospital accreditation that led to the enactment of § 13-a, as indicated by the records of the Health and Welfare Committee of the New Hampshire House of Representatives for the 1981 Session. Minutes of testimony by one of the sponsors of HB 842 (which on passage enacted § 13-a), a staff memorandum, and testimonial statements filed with the committee identify the impetus for the bill as the Joint Commission's 1980 revision of a requirement that each hospital systematically and critically review the quality of care delivered in the institution. Although Joint Commission literature from 1980 has not been quoted to us, relevant parts of the Joint Commission's subsequent accreditation manual have been submitted without objection. The manual describes it as one of the "key factors" bearing on accreditation that a hospital's medical staff provide "effective mechanisms to monitor and evaluate the quality and appropriateness of patient care and clinical performance of all individuals with delineated clinical privileges. Important problems in patient care are identified and resolved, and opportunities to improve care are addressed . . . ." *Joint Commission on Accredi-*

*tation of Hospitals, AMH/86,* ACCREDITATION MANUAL FOR HOSPITALS § 10.6.1 (1985). The intended function of such "mechanisms" may be distinguished clearly from the treatment of individual patients, in that evaluation of quality or appropriateness is an essentially retrospective process based on the analysis of what has already been done, for the purposes of providing instruction and deriving standards to be applied in future cases. *See generally Bredice v. Doctors Hospital, Inc.,* 50 F.R.D. 249, 250 (D.D.C. 1970), *aff'd* 479 F.2d 920 (D.C. Cir. 1973).

The reason for seeking enactment of § 13-a, and its counterparts in other jurisdictions, was the natural reluctance of hospital employees and staff members to engage in such evaluation after the fact, by furnishing information and voicing critical judgments, if in so doing they would also be compiling a fund of material discoverable by adverse parties in any subsequent litigation against the hospital. *See Bredice supra;* Note, *The Privilege of Self-Critical Analysis,* 96 HARV. L. REV. 1083, 1092 (1983). State legislatures were accordingly asked to advance the general public interest in promoting a hospital's vigorous self-criticism by immunizing its process and products from discovery by a particular litigant. *See, e.g., Santa Rosa Memorial Hosp. v. Superior Court,* 220 Cal. Rptr. 236, 241 (Cal. Ct. App. 1985). The result in New Hampshire was § 13-a.

Because the legislature's object was to protect and foster a function mandated by the Joint Commission, the scope of the Joint Commission's mandate is a reasonable indication of the intended scope of the protection. One significant detail of that mandate has already come to our notice. The statement of the general review standard quoted above speaks of the need for effective mechanisms, in the plural, for monitoring and evaluating the quality of care. The plural character of that requirement is reflected in the Joint Commission's assignment of responsibility for such monitoring and evaluation to the chairman of each department in hospitals large enough to be organized on a departmental plan, *see* ACCREDITATION MANUAL, *supra* § 10.6.1.1.1, and in the further requirement to monitor and evaluate infection control on a "hospitalwide" basis, ACCREDITATION MANUAL § 17.2.3.

Underlying these multiple assignments is the apparent assumption that critical review and evaluation will be done best by those who know the most about the particular subject of the study, and it is not hard to see why. If the "mechanism" for scrutiny were limited to one committee in a hospital with a wide range of services, the committee would either be unworkably large for the sake of

including a full complement of expert specialists, or would be kept to a reasonable size only by sacrificing needed depth. The Joint Commission accordingly decided that in sizable hospitals review ought to be conducted by committees devoted to limited subjects and not by a single review body. Consequently, from the legislative objective to create a privilege commensurate with the Joint Commission's requirements, we infer the intent to provide that privilege to each of the several quality assurance committees required by the Joint Commission's standards in a large, departmentally organized hospital like Mary Hitchcock. Those committees, as we just noted, would include one on infection control.

Nor is there any telling evidence in the record for the contrary view, that the privilege should be confined to a single "quality assurance committee" per hospital. It is true that some documents presented to us as items of legislative history speak in the singular of "a" committee as the subject of the proposed privilege; *e.g.*, a staff memo of the Health and Welfare Committee, mentioned above. But assuming *arguendo* that we should consider such a document for interpretive purposes, its weight is countered by the analysis printed as part of the original HB 842, which speaks in the plural of extending a privilege to the "records and proceedings of hospital committees organized to monitor and improve the quality of patient care . . . unless *the* hospital waives *its* privilege." HB 842 (1981 Session) (emphasis supplied).

It is, indeed, the text of the bill as originally drafted that probably explains how the statute, as finally enacted, came to speak variously of "a" and "the" quality assurance committee. As odd as it may seem, the bill originally introduced included no name or description for the committee to which it was supposed to refer. Thus, paragraph II originally spoke of "[r]ecords of a hospital committee," followed by a reference to "testimony . . . relating to activities of the committee. . . ." In this fashion, "the committee" simply referred back to "a committee," whatever the latter might be, and the use of the definite article carried little or no suggestion that a hospital might have only one such committee. The House amended the bill, however, by describing the "committee" as being concerned with "quality assurance," thus limiting the privilege to such a committee. N.H.H.R. JOUR. 471 (1981). But when the descriptive adjectives were inserted into the bill, "the quality assurance committee" took on a hint of singularity that the use of the definite article had not carried in the original draft, and raised the question that we can hardly blame the trial court for finding troublesome. Our look at legislative history has indicated, however,

that the suggestion of ambiguity is more likely the result of inattention when amending the original draft than of any purpose to ration privileged quality assurance committees one to a hospital.

■ In accordance with legislative intent to provide the privilege to records and testimony associated with any committee engaged in the process of quality assurance, we hold that the focus of the privilege under § 13-a is not necessarily limited to one committee in a departmentally organized hospital, and in view of the Joint Commission's recognition of infection control as a subject of quality assurance responsibility, we hold that a committee organized for the critical evaluation of procedures affecting the transmission of infections within a hospital may receive testimony and generate records subject to the statutory privilege. *Accord Santa Rosa Memorial Hosp. v. Superior Court*, 220 Cal. Rptr. at 241–43; *Palm Beach Gardens Community Hospital, Inc. v. Shaw*, 446 So. 2d 1090, 1091 (Fla. App. 1984); *City of Edmond v. Parr*, 587 P.2d 56, 58 (Okla. 1978); *Farley v. County of Nassau*, 95 A.D.2d 583, 584, 459 N.Y.S.2d 470, 471 (App. Div. 1983).

It remains for us to consider whether in this case the hospital's Infections Committee falls within the statutory description of a quality assurance committee, and whether Mrs. Watkins's enquiry was a source of privilege for the materials sought by the plaintiff. The committee is charged by the hospital with responsibility for

"determining and recommending appropriate measures for infection prevention and control [and]

. . . .

". . . initiating reporting of actual or suspected Hospital acquired infections, ordering culture and sensitivity testing, and instituting any appropriate control measures or studies when the possibility of intra-hospital infection is reasonably felt to be a danger to any individual."

The committee is thus authorized to study infections present within the hospital as well as those that may have occurred in the past, and to recommend action for controlling current infections as well as for limiting the risk of infection in the future. It could well be, therefore, that the committee would offer a recommendation for controlling a particular, current infection, in the form of advice about the treatment of a particular patient while in the hospital, but it does not appear that the committee members as such would ever take a direct role in treating patients, and we see in the committee's charge nothing at odds with Mrs. Watkins's testimony that she herself takes no role in a given patient's treatment. It is

equally clear, in any event, that the drafters of the committee's charge supposed the committee's function would normally be a combination of retrospective study and prospective, general recommendation, in the discharge of which it would suffice for the committee to "be convened on an average of [e]very two months" and to report "its findings and recommendations" to various hospital officials. The committee therefore obviously has a quality assurance responsibility contemplated by the statute, although its duties may not be limited to quality assurance review alone.

Whether Mrs. Watkins's activities in this case should be treated as a source of privilege for the resulting materials comprises two separate questions, whether her enquiry was confined to the object of quality assurance, and whether she was authorized to act on the Infections Committee's behalf. There is no serious question that the retrospective nature of the functions performed in this case were efforts to promote quality assurance, not individual treatment. K had been discharged when her husband asked Mrs. Watkins to look into the matter, and there is no indication that anyone representing the committee or the hospital participated in treating K for the herpes infection. Mrs. Watkins's testimony that she had provided no treatment was uncontradicted, as was the evidence that she was attempting to learn whether K's infection had been acquired in the hospital and, if so, how. Thus, it could only be found that Mrs. Watkins made the enquiry for the purpose of analyzing prior treatment for the sake of understanding the hospital's practices and judging their quality, from which it follows that if Mrs. Watkins's acts should be treated as acts of the Infections Committee, both her report and the committee's minutes that relate to it must be treated as privileged. (As will be seen, we have no occasion to decide whether the minutes would also be privileged if they reflected an investigation conducted independently of any committee authority.)

■ The need to question whether Mrs. Watkins's enquiry should be treated as action authorized on the committee's behalf is prompted by the legislature's definite limitation of the privilege to records generated by a committee and testimony before it. Individual forays into quality assurance are not privileged under the statute, and the general rule is that such privileges are to be narrowly construed. *See Marceau v. Company*, 97 N.H. 497, 499, 92 A.2d 656, 657 (1952). Consequently, the fact that K's complaint was not presented to the full committee in the first instance deserves attention, as does the fact that Mrs. Watkins received no specific assignment from the committee to investigate and report on this complaint.

14

Nevertheless, on the record before us there can be no doubt that the nurse epidemiologist's actions must be treated as an exercise of committee authority. Not only was she a member of the committee in her own right, but in a further provision of the committee's charge, from which we have already quoted, the hospital expressly "delegated" immediate responsibility for the performance of the Infections Committee's duties "to the Chairman . . . , the Nurse Epidemiologist or, in their absence, another physician member . . . ." There was thus no need for the nurse epidemiologist to wait a day, a week or a month for an assignment from the full committee in order to act within the scope of the committee's agency in responding to K's husband's concerns. That being so, her report should be treated as a committee record, as having been "generated during the activities of a quality assurance committee," RSA 151:13-a, I (Supp. 1988), and as privileged, together with the related segment of the committee's minutes.

K nonetheless argues that this result ignores both the exception to the statutory privilege for "original hospital medical records . . . kept relative to any patient," RSA 151:13-a, I (Supp. 1988), and the common law policy of construing testimonial privileges narrowly. The hospital has the better of each argument, however.

The paragraph I exception of a patient's original medical records from "records" subject to the privilege was evidently meant to refer to the records of the patient's treatment. The distinction was noted in the Senate debate on HB 842, when Senator Champagne explained that the privilege would apply only to the hospital's quality review committee records, not to preexisting records to which the committee might refer. N.H.S. JOUR. 1410 (1981). That is, such a committee was not meant to have a Midas touch; it cannot convert a treatment record into a privileged review committee record merely by taking it into consideration. *Cf. Riddle Spring Realty Co. v. State*, 107 N.H. 271, 274, 220 A.2d 751, 755 (1966) (document not invested with attorney-client privilege, merely by delivery from client to attorney). Since the distinction between committee records and treatment records is clear, there is nothing in the "original medical records" exception that could avail K in seeking this discovery. *Accord Cofone v. Westerly Hosp.*, 504 A.2d 998, 1000 (R.I. 1986); *Anderson v. Breda*, 103 Wash. 2d 901, 906, 700 P.2d 737, 741 (1985); *Texarkana Memorial Hospital, Inc. v. Jones*, 551 S.W.2d 33, 35 (Tex. 1977).

Nor is there any tension between our holding and the narrow view of evidentiary privileges that the plaintiff believes to be exemplified in certain decisions from other jurisdictions, refusing

in specific instances to recognize the quality review board privilege. *E.g., State ex rel. St. John's Mercy v. Hoester,* 708 S.W.2d 796, 798 (Mo. App. 1986); *Anderson v. Breda, supra* at 906–08, 700 P.2d at 741–42. In *Hoester* the court stated it would deny a properly framed claim of privilege for records of committees not organized to conduct "peer review," and in *Anderson* the claim was denied when its proponent failed to establish, *inter alia,* the existence of a regularly established quality review committee as a source of the privilege. Needless to say, we would hold the same under our own statute, simply because it plainly conditions the privilege on the existence of a committee structure organized to perform the particular review function we have explained. *Accord Santa Rosa Memorial Hosp. v. Superior Court,* 220 Cal. Rptr. at 241–43.

■ Once, however, it is understood that the requisite committee structure and quality review function are present, our traditionally limiting approach to privilege claims must be honored by recognizing that the privilege does not go beyond the records or testimony, as such, to which the statute refers. As we observed before, a quality assurance committee's attention does not place its subject matter beyond the bounds of discovery or disclosure in the normal course; the privilege is confined to the records and testimony described in the statute. *See* N.H.S. Jour. 1410–14 (1981). Thus, the ordinary record of a patient's treatment remains admissible as it always has been, even though a quality assurance committee may have studied that record and issued a report based on data culled from it. And a physician may still be obligated to testify about the course of a patient's case, and to render a professional evaluation of the treatment, even though a quality assurance committee may already have elicited the same testimony on the same subject in the course of its own proceedings.

■ Equally unavailing is the plaintiff's effort to narrow the scope of § 13-a by positing its conflict with RSA 151:20, II (Supp. 1988), which provides that a licensed health care facility, including a hospital, "shall establish written procedures . . . for the investigation and resolution of complaints made by or on behalf of patients." This provision is not in point. Leaving aside the question whether "resolution" of a complaint might require the sort of disclosure the plaintiff seeks, the provision for resolving "complaints" occurs in a sentence requiring health care facilities to implement the "guarantee [of] patients' rights," *id.,* which are then listed at some length in the following statutory section, RSA 151:21 (Supp. 1988), entitled the "Patients' Bill of Rights." The context

thus indicates that appropriate subjects of the "complaints" are limited to violations of the rights so guaranteed. These rights cover matters such as access to information about one's medical condition while in the facility, *id.*, III; management of personal finances, *id.*, VI; freedom to communicate with others, *id.*, XII; and freedom from racial discrimination, *id.*, XVI. The bill of rights does not, however, purport to be a device to regulate professional due care in providing treatment, and there is no evidence in the text of the statute or the journals of the legislature that the extension of the bill of rights legislation to cover hospitals as well as nursing homes by Laws 1983, 274:8, :10 was meant to effect an implied repeal or amendment of RSA 151:13-a. The right to the resolution of a bill of rights complaint does not, therefore, carry with it a right to discover quality assurance review records.

Finally, the plaintiff seeks to sustain the trial court's result on the three further grounds that any statutory privilege for the report and minutes would violate the State constitutional guarantee of prompt and free remedies, *see* N.H. CONST. pt. I, art. 14, as well as the guarantee of equal protection, *id.*, art. 12, and that any privilege the statute might otherwise have provided was waived by Mrs. Watkins's conversation with K on August 23. The defendant has moved to strike the plaintiff's brief insofar as it addresses the latter two grounds, a position we believe to be well-taken and applicable to the first as well.

Our Rule 16 provides that the question addressed in a brief "shall be the same as the question previously set forth in the appeal document . . . [although the latter] will be deemed to include every subsidiary question fairly comprised therein." SUP. CT. R. 16(3)(b). If an appellee wishes to present issues properly raised in the trial court but not stated in the appellant's notice of appeal, the appellee may, if it is appropriate, follow Supreme Court Rule 7(5), which allows a notice of cross-appeal to be filed within ten days of the appellant's notice, or may invoke Supreme Court Rules 16(3)(b) and 16(4), which provide that a party may add a further question by order of the court on motion filed at least twenty days before the party's brief is due. In this case, since K filed no cross-appeal and never moved to add issues, the scope of the appeal is limited by the hospital's notice of appeal.

The hospital's notice of appeal presented only two questions: whether the Infections Committee is a quality assurance committee within the meaning of RSA 151:13-a (Supp. 1988), and whether the report was privileged as having been generated in the course of such committee's activities. K's three additional issues fall outside

the scope of these two questions. Whereas the questions properly raised go directly to the merits of the privilege claim, by asking whether the committee minutes and the nurse epidemiologist's work product fall within the scope of the statutory definitions, the plaintiff's further three grounds are collateral to these central issues. On each of the three further points, K starts by assuming the statute applies and then seeks to argue the entirely different point that the statute should be held inoperative, either because it would produce an unconstitutional result or because the defendant has waived its protection. These issues could not have been anticipated from a reading of the questions stated in the notice of appeal, and if they could now be raised without leave of the court, the court would lose control over the appellate process. Because, on the contrary, both the court and opposing counsel must be able to rely on the questions presented as indicating what the court is agreeing to review, such collateral issues cannot be treated as "subsidiary [to and] fairly comprised" by the questions raised.

Although we thus hold all three issues to be off-limits in this appeal, we may also observe that K's counsel need not be faulted for failing to make formal efforts under Rules 7(5), 16(3)(b) and 16(4) to inject these afterthoughts into the case. The plaintiff's essay at raising the constitutional issues simply overlooks the difference between the statutes considered in cases like *Carson v. Maurer*, 120 N.H. 925, 424 A.2d 825 (1980) and *Gould v. Concord Hospital*, 126 N.H. 405, 493 A.2d 1193 (1985), which struck down temporal and procedural limitations on the very right to bring action, and the present statute, which merely bars the discovery and admissibility of a limited category of evidence insofar as it was collected or generated for a specific purpose after the allegedly tortious event. Unlike the legislation considered in *Carson* and *Gould*, the statute in question here simply leaves certain potential malpractice plaintiffs in the position of any litigant, or intending litigant, who cannot depend on the luxury of relying on the opposing party to furnish pretrial investigation and preliminary expert evaluation.

The collateral argument for waiver strikes us as comparably short-sighted in failing to recognize that, regardless of what Mrs. Watkins may or may not have told K during their telephone conversation, the statute explicitly provides that a hospital's governing board may waive the privilege, *see* RSA 151:13-a, III (Supp. 1988), with the obvious negative implication that no one else may do so. *See In re Gamble*, 118 N.H. 771, 777, 394 A.2d 308, 311 (1978). In sum, these collateral issues are not only outside the scope of appeal as originally brought to us, but deservedly so.

The discovery order is reversed, and the petition is dismissed.

*Reversed and dismissed.*

JOHNSON, J., did not sit; BATCHELDER, J., concurred specially; the others concurred.

BATCHELDER, J., concurring specially: During oral argument, the plaintiff raised the question of whether RSA 151:13-a would prevent her from obtaining the results of tests performed on the blood sample she provided at Mrs. Watkins' request at a time when Mrs. Watkins was acting on behalf of the committee. This relief was not sought in the plaintiff's original petition. I concur in today's holding because I do not understand it to preclude a plaintiff from obtaining the results of such blood tests, which I do not take themselves to be "committee records" as defined by the statute. This case encourages medical personnel in the pursuit of quality care and is of importance in the field of hospital administration, but its scope is necessarily limited. The plaintiff continues to have access to any medical records pertaining to her care and treatment and is only deprived by the statute of what might be considered the work product of the committee.