9 F.3d 1535
 NOTICE: First Circuit Local Rule 36.2(b)6 states unpublished opinions may be cited only in related cases.
Kimberly F. AND John F., Plaintiffs, Appellees,
v.
MARY HITCHCOCK MEMORIAL HOSPITAL AND HITCHCOCK CLINICS,
INC., Defendants, Appellants.
 No. 93-1438.
 United States Court of Appeals,
First Circuit.
 December 3, 1993
 
 APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF NEW HAMPSHIRE
 Hon. Clarence C. Newcomer, Senior U.S. District Judge*
 Bradford W. Kuster, for appellants.
 Francis G. Murphy, Jr., for appellees.
 D.N.H.
 AFFRIMED.
 Before Cyr, Circuit Judge, Bownes, Senior Circuit Judge, and Boudin, Circuit Judge.
 BOWNES, Senior Circuit Judge.
 
 
 1
 This is an appeal by defendants-appellants, the Mary Hitchcock Memorial Hospital and the Hitchcock Clinic, Inc., from a jury verdict finding them liable to plaintiffs-appellees, Kimberly F. and her husband, John F., because of negligent care given Kimberly F. while she was a patient at the Mary Hitchcock Memorial Hospital. John F.'s suit was for loss of consortium. We, therefore, treat the plaintiffs as one. The Hitchcock Clinic, Inc. is an incorporated association of physicians and surgeons, some of whom treated Kimberly F. while she was at the hospital. Because of the nature of Kimberly F.'s injury, it was agreed that she and her husband could use pseudonyms to keep some degree of anonymity.
 
 
 2
 Kimberly F. was admitted to the obstetrical unit of the hospital on August 2, 1986. She gave birth to a son on August 3. The child was full term. There were no birth complications, and she was discharged on August 5. One week later, on August 13, Kimberly F. was diagnosed as having an outbreak of genital herpes. She subsequently sued the defendants alleging that she was infected with herpes while at the hospital and that defendants negligently failed to protect her from such infection. Plaintiff also brought a count for failure to obtain informed consent.[1] The jury found defendants not liable on this count and there has been no appeal from this finding.
 
 
 3
 Defendants raise three issues before us: that, as a matter of law, there was insufficient evidence for the jury's finding of negligence; that testimony was improperly admitted; and that the closing argument of plaintiff's counsel on pain and suffering was improper. We discuss the issues seriatim.
 
 I.
 SUFFICIENCY OF THE EVIDENCE
 
 4
 In ruling on an appeal from the denial of a motion for a directed verdict, we conduct a plenary review of the evidence. Our review of the evidence and all reasonable inferences therefrom is made in the light most favorable to the non-moving party. American Private Line Services, Inc. v. Eastern Microwave, Inc., et al., 980 F.2d 33, 35 (1st Cir. 1992); Gallagher v. Wilton Enterprises, Inc., 962 F.2d 120, 124 (1st Cir. 1992). The denial of a motion for judgment n.o.v. is also subject to plenary review. The standard of review is whether the evidence and all reasonable inferences therefrom could lead a reasonable person to but one conclusion: that the moving party was entitled to judgment. Pontarelli v. Stone, 930 F.2d 104, 113 (1st Cir. 1991); Hendricks & Associates, Inc. v. Daewoo Corp., 923 F.2d 209, 214 (1st Cir. 1991). We have conducted the requisite review and find that the district court was correct in denying the motions for a directed verdict and judgment n.o.v.
 
 A. The Evidence
 
 5
 The evidence viewed in the light most favorable to plaintiff was as follows. When she was admitted to the hospital on August 2, 1986, plaintiff had no prior history of herpes. When plaintiff was examined by defendants on August 13, she was diagnosed as having an outbreak of genital herpes. Such an outbreak is characterized by lesions in the infected area. The incubation period for a herpes infection is two to twenty-six days. Plaintiff entered the hospital on August 2, was discharged on August 5, and the medical diagnosis of genital herpes was made on August 13. She was well within the herpes incubation period.
 
 
 6
 Genital herpes is a life-long affliction and, as is true of other types of herpes, is incurable. Outbreaks of herpes, manifested by lesions and cold sores, occur from time to time during the victim's life. The first attack is usually the most severe. The genital herpes outbreak diagnosed on August 13 was a primary (first-ever) outbreak, i.e., plaintiff never had a herpes outbreak prior to this time. Plaintiff's sexual history was as follows. She had sexual intercourse twice in high school; both times her partners used condoms. She married for the first time in 1981. After her first child was born she was divorced. The divorce became final in 1982 or 1983. She met her present husband in 1984. She had no sexual relations with other men between separating from her first husband and meeting her present one. Neither she nor her husband had ever engaged in oral sex at any time. Plaintiff's husband has never had any herpes symptoms.
 
 
 7
 When plaintiff was first admitted to the hospital she was put in a birthing room that shared a bathroom with another patient. Plaintiff went into the bathroom alone because no one had come in response to her pushing the nurses' call button. She felt dizzy and sat on the toilet to avoid falling. In so doing, she sat on a urine catch basin that was in the toilet bowl. The basin contained urine from the other patient. As her labor pains increased in frequency, a nurse suggested a warm bath might help. She was taken to a room with a bathtub. Both she and her husband noted that the tub contained some dead bugs. There was an open window with no screen. Plaintiff's husband cleaned out the tub and she took a bath. During the birthing process, an episiotomy was done. This consists of making a surgical incision into the perineum and vagina so as to prevent tearing during delivery. Prior to delivery, nurses examined plaintiff internally to see whether her cervix had dilated. Some of the nurses did not wash their hands in the sink in plaintiff's room before examining her.
 
 
 8
 After delivery, plaintiff experienced pain and discomfort at the site of the episiotomy. Reusable plastic ice packs were applied to ease her discomfort. The ice packs were wrapped in sterile green surgical cloth. At times, the pack was placed over plaintiff's vaginal area in such a way that the surgical cloth did not completely cover the plastic bag. This resulted in direct contact between the site of the episiotomy and the plastic bag. On the day of plaintiff's discharge a nurse came in and checked plaintiff's perineal area and touched the episiotomy site with her hands. The nurse had not washed her hands, nor was she wearing gloves.
 
 
 9
 On July 31, a patient was admitted to the obstetrics unit of the hospital with a herpes lesion behind her right knee. The patient was placed on herpes isolation precautions during all of the time she was at the hospital. This entailed strict procedures to prevent the patient's herpes infection from spreading to other patients. This patient was discharged on the morning of August 2; plaintiff was admitted at 11:30 p.m. on August 2.
 
 
 10
 A second patient with herpes was in the maternity ward at the same time as plaintiff. This patient, "J.D.,"[2] occupied the same room as did plaintiff immediately prior to plaintiff being put in the room. The records of J.D. show that because she had had monthly episodes of herpes outbreaks during her pregnancy, she was admitted "at risk," and was placed on herpes infection precautions. A herpes culture was taken from J.D.'s right labial lesion on July 28. It was noted in her records that she was at high risk and herpes infection precautions were continued. J.D. gave birth via a Caesarean section on July 29. Her records show that the reasons for the Caesarean section were that the baby was breached and that J.D. was at risk with herpes. On July 30, a nurse's note in J.D.'s records stated that she had two lesions on the left outer lower labia. A subsequent note on the same day states that J.D. continued to have lesions on the left lower labia. There is nothing in the record indicating that any culture was taken from the lesions on her left lower labia. The only culture taken was from the lesion on the right labia. The lab report on this culture was necessarily a preliminary one; it was negative for herpes. A negative culture report on herpes normally includes the statement, "these results do not exclude infection with herpes simplex virus." This report did not so state. On the evening of August 2, the day that plaintiff was admitted to the hospital, J.D. was transferred to the second floor. Later that evening she told a nurse that she was concerned about the fact that she was still on herpes infection precautions. The nurse, Linda Morgan, recorded in her chart that J.D. wanted to be taken off herpes infection precautions and that she had shown no lesions since July 29. This information was given by telephone to Dr. Ketterer and the same night, August 2, he gave a verbal order to remove J.D. from herpes precautions.
 
 
 11
 Nurse Morgan admitted during her testimony that she did not tell Dr. Ketterer about the lesions on J.D.'s left labial area. Dr. Ketterer admitted that his decision to take J.D. off herpes infection precautions was based on incomplete information. About two hours after J.D. was taken off precautions, plaintiff was admitted to the hospital. She spent the next eight hours in labor and delivery on the second floor, where J.D. was also located. Both plaintiff and J.D. were discharged from the hospital on the same day, August 5.
 
 
 12
 Two nurses, J.W. and M.W., had herpes and worked in the maternity ward of the hospital while plaintiff was a patient there. J.W. had a history of genital herpes. She gave direct patient care to plaintiff, which included placing ice packs on her perineum and physically examining her. There was no direct evidence that the other nurse with herpes, M.W., had patient contact with plaintiff, but she was present on the maternity ward and available to give care to all of the patients in the ward.
 
 
 13
 All of the doctors who testified agreed, in effect, that it would be a violation of acceptable hospital infection precautions for a patient to be infected by herpes while a hospital patient.
 
 B. Testimony of Plaintiff's Expert Witness
 
 14
 Appellants' attack on the sufficiency of the evidence focuses on the testimony of plaintiff's expert witness, Dr. James Kahn. Their claim is that "no expert witness identified any act of negligence that more probably than not caused the infection." Appellants' Brief at 9. Both sides agree that New Hampshire law controls this issue. We will therefore examine New Hampshire law and rule accordingly.
 
 
 15
 In Thorpe v. New Hampshire Department of Corrections, 575 A.2d 351, 353 (N.H. 1990), the court stated: "The general rule in medical malpractice cases is that the proximate cause between the negligence and the injury must be established through expert testimony." In Martin v. Wentworth-Douglass Hospital, 536 A.2d 174, 176 (N.H. 1987), the court held that expert testimony was necessary to establish the causal link between the injury complained of and the health care provider sought to be held accountable, and "[t]he quantum of such evidence necessary to survive a motion for nonsuit had to be enough to warrant the conclusion of a reasonable juror that the causal link probably existed." See also Wilder v. Eberhart, 977 F.2d 673, 676 (1st Cir. 1992). In Pillsbury-Flood v. Portsmouth Hospital, 512 A.2d 1126 (N.H. 1986), the court held:
 
 
 16
 In New Hampshire, the plaintiff in a medical malpractice action must prove that the defendant's negligence caused the patient's injury or loss. See Carrigan v. Sacred Heart Hospital, 104 N.H. 73, 80, 178 A.2d 502, 506-07 (1962). "[N]egligent conduct is a proximate or legal cause of harm, if the actor's conduct is a 'substantial factor in bringing about the harm.' " Maxfield v. Maxfield, 102 N.H. 101, 105, 151 A.2d 226, 230 (1959) (quoting Restatement of Torts § 431(a) (1934)). This issue is normally one for the trier of fact once a prima facie case is established. See id.; W. Keeton, D. Dobbs, R. Keeton & D. Owen, Prosser and Keeton on the Law of Torts § 41, at 269 (5th ed. 1984) (hereinafter cited as Prosser & Keeton).
 
 
 17
 Id. at 1129.
 
 
 18
 We now turn to Dr. Kahn's testimony. There was no objection to Dr. Kahn's expert qualifications in the field of infectious diseases. The crux of his testimony came in the answers to a series of questions. Dr. Kahn was asked: "Based on your review of all the information, do you have an opinion, based on reasonable medical probabilities, as to whether or not Mrs. F.'s infection, outbreak of herpes in August of 1986 was a primary infection?" He answered: "Yes, I continue to feel very emphatically that it was a primary infection." In prior testimony Dr. Kahn had explained that the term "primary infection" meant a first-ever herpes infection. Dr. Kahn had explained the nature of herpes infections and how outbreaks of the disease are manifested.
 
 
 19
 The next question bearing on the issue was: "Do you have an opinion, based on reasonable medical probabilities, as to whether or not the hospital was the probable source of-general source of Kimberly F.'s infection in August of 1986?" Dr. Kahn answered that the infection was clearly associated with the plaintiff's hospitalization. The following question was then asked: "What were the possible means of transmission within the hospital that could have resulted in her infection?" There was an objection based on the use of the word "possible;" that "the plaintiffs' burden of proof is probabilities." The court denied the objection, pointing out that the main question was premised on reasonable medical probabilities, and these were the factors the expert considered in arriving at his opinion. Dr. Kahn was asked again to state the possible sources of plaintiff's infection. He answered: "The likeliest, I think, is another patient who at the time of your client's hospitalization had what to all intents and purposes sounded like a recurrent genital herpes outbreak and in at least one instance shared a care giver over a short period of time." This answer was followed by a series of questions and answers:
 
 
 20
 What is your understanding as to whether or not there was any potential patient source at the hospital?
 
 
 21
 A. My understanding from reading the record is that there were two patients that I'm aware of who had what was either diagnosed by somebody else as an active herpes infection or to my reading certainly compatible with an active herpes infection.
 
 
 22
 Q. Were both those patients possible sources?
 
 
 23
 A. Yes, I think they're both possible sources.
 
 
 24
 Q. Would you consider health care workers as possible sources?
 
 
 25
 A. Yes, they're possible sources too, yes.
 
 
 26
 In his prior testimony Dr. Kahn had discussed inanimate objects-called fomites-such as toilet seats, flat surfaces and ice packs, as potential transmission sources of herpes. He was asked if he considered fomites as a possible infection source.
 
 
 27
 I did. I considered them, but my own judgment is that that's considerably less likely. I know there was one instance in particular-I don't know if it's been raised before so I don't know if I should mention it-well, I read it so I guess I can mention there was some talk about an ice pack applied to the perineum.
 
 
 28
 My sense of that was that even though the ice pack could have been wrapped in gauze and therefore, could have held the virus in it, it was more consistent with what we know about herpes transmission, that it was the hand of the nurse applying the ice pack rather than the ice pack that would have been the likelier source of transmission.
 
 Dr. Kahn was then asked:
 
 29
 Having considered all of the potential sources of infection, did you arrive at one that was most likely in your mind?
 
 His answer was:
 
 30
 I think the likeliest explanation is the patient who had vaginal lesions with a second crop on the left labia, I believe, and was taken care of at one point by a health care giver who very shortly thereafter took care of Kim [plaintiff].
 
 
 31
 Dr. Kahn identified the patient as J.D. He then testified that, in light of the fact that the hospital records showed that J.D. had left labial lesions that had not been cultured it was imprudent to take her off herpes infection precautions. He testified:
 
 
 32
 The probability or the possibility of her having transmission-transmissible viruses was very high based on her history and her presentation.
 
 
 33
 On cross-examination Dr. Kahn was asked, "Is the best you can say is that J.D. is a possible source of the herpes infection in this case?" Then came the following exchange:
 
 
 34
 A. Comparing her to the other patient, I'd say very possible. But again, I can't say probable or with definite certainty. But a very credible likelihood.
 
 
 35
 Q. So the best you can say is possible, but you cannot say probable, correct?
 
 
 36
 A. Slightly high on the possible but not probable. "Probable" meaning certainty, high possible meaning that's my choice.
 
 
 37
 To our knowledge, no New Hampshire case requires the incantation of the word "probable" to establish probable causation. In a case involving expert testimony the New Hampshire Supreme Court held:
 
 
 38
 The possibility that the blasting caused the damage could reasonably be found "the most probable possibility disclosed by the evidence," and blasting the most probable cause. Emery v. Tilo Roofing Company, 89 N.H. 165, 167, 195 A. 409, and cases cited.
 
 
 39
 Crocker v. W.W. Wyman, Inc., 110 A.2d 271, 274 (N.H. 1954). In Emery v. Tilo Roofing Company, 89 N.H. 165, 195 A. 409 (N.H. 1937), the issue was the cause of a fire to the roof of a building. Defendant was hired to re-roof the building. There was evidence that defendant's employees were seen smoking cigarettes on the roof before the fire started. There was no direct evidence that the fire had been caused by a cigarette stub. In upholding a verdict for plaintiff the court stated:
 
 
 40
 That the fire was caused by a cigarette stub was the most probable possibility disclosed by the evidence and we think that the jury were justified in finding it to be more probable than otherwise that the fire resulted from this cause. Staples v. Railroad, 74 N.H. 499. "It is not a case of conjecture between equal possibilities, but the ordinary determination of a conclusion from inferences supported by a balance of probabilities." Saad v. Papageorge, 82 N.H. 294. Not only was the conclusion of the jury as to the cause of the fire proper as a direct inference from the testimony but the improbability of any other explanation "as an exclusionary premise may serve to strengthen the force of the deduction."
 
 
 41
 Id. at 167.
 
 
 42
 In the case before us the main defense was that plaintiff was infected with herpes before she was admitted to the hospital. There was no direct evidence of such an infection. As with the plaintiff's evidence, it depended on expert testimony.
 
 
 43
 We read Dr. Kahn's testimony to say that the probable cause of the infection was one or more acts of negligence by the hospital, and find that this conclusion, which was rationally supported and explained, is sufficient to establish causation even though the doctor could not identify a single cause as the more-likely-than-not cause of this infection. It follows, therefore, that the jury verdict that the plaintiff was infected with herpes while a patient at the Mary Hitchcock Memorial Hospital is unassailable on causation grounds.
 
 II.
 THE ADMISSION OF TESTIMONY
 
 44
 Defendant's argument on this issue is stated as follows:
 
 
 45
 The Trial Court Abused Its Discretion By Allowing The Plaintiffs To Ask Nurse Watkins Whether She Had Investigated The Source Of Kimberly F.'s Infection
 
 
 46
 A. Mrs. Watkins's Testimony About Her Investigation on Behalf of the Infections Committee Was Precluded by the Express Terms of the Statute Appellants' Brief at -i-.
 
 
 47
 We have scoured the record and can find no question by plaintiff's counsel on direct examination of Nurse Watkins asking "whether she had investigated the source of Kimberly F.'s [plaintiff's] infection." Nor have we been able to find any testimony by Nurse Watkins about her investigation on behalf of the Infections Committee.
 
 
 48
 Nurse Watkins testified that plaintiff's husband spoke to her in 1986 about the source of plaintiff's infection. At that time he was employed by the Mary Hitchcock Memorial Hospital as an echocardiography technologist and knew Nurse Watkins as a co-worker. Plaintiff's husband knew that Nurse Watkins' special responsibility was infection control and transmission of infectious diseases. According to Nurse Watkins, when plaintiff's husband spoke to her he had three specific concerns: the use of ice packs, lack of cleanliness generally in the hospital, and the dirty bathtub. Nurse Watkins said she would look into it. She denied that the husband asked her "to inquire into a few things." She never informed the husband about anything bearing on the source of plaintiff's infection. Nor did she tell him that she would make an investigation for the hospital. Most of the direct examination of Nurse Watkins by plaintiff's counsel focussed on the infection control procedures used at the hospital.
 
 
 49
 Nurse Watkins was also asked questions about entries in the plaintiff's hospital records by the doctors and nurses who treated her.
 
 
 50
 On cross-examination Nurse Watkins gave the following testimony:
 
 
 51
 Q. Given your job as [sic] the hospital, as nurse epidemiologist, what do you generally do when a, a question of a hospital-acquired infection is brought to you?
 
 
 52
 A. Well, it's my job to look into the circumstances of the infection, with the primary being a focus to identify practices which could be improved to decrease the risk of similar infections in the future.
 
 
 53
 I also had the responsibility for educating hospital personnel about infection risk and transmission again so that their practice will decrease the risk of transmission.
 
 
 54
 Q. Now, did you take those steps when Mr. F. came to you and suggested the problems he did?
 
 
 55
 A. Certainly I looked into the situation, yes.
 
 
 56
 Q. What did you conclude?
 
 
 57
 There was an objection by plaintiff's counsel to the last question which was upheld on the ground that it was precluded by N.H. Rev. Stat. Ann. ch. 151:13-a (1981).
 
 
 58
 Before we discuss the scope of the New Hampshire statute we also must point out another serious omission in the record. Defense counsel made no objection to any of the questions pertinent to this issue asked by plaintiff's counsel. This was a waiver of the issue under Fed. R. Evid. 103(a)(1).[3] Nor is this omission cured because defendants had filed a motion in limine at the start of trial. Objections to questions must be made when the questions are asked. We also point out that there was not even a general objection to the line of questioning, although we do not suggest that this would have been sufficient to preserve defendants' rights.
 
 
 59
 The pertinent provision of the New Hampshire statute provides:
 
 
 60
 II. Records of a hospital committee organized to evaluate matters relating to the care and treatment of patients or to reduce morbidity and mortality and testimony by hospital trustees, medical staff, employees, or other committee attendees relating to activities of the quality assurance committee shall be confidential and privileged and shall be protected from direct or indirect means of discovery, subpoena, or admission into evidence in any judicial or administrative proceeding, except that in the case of a legal action brought by a quality assurance committee to revoke or restrict a physician's license or hospital staff privileges, or in a proceeding alleging repetitive malicious action and personal injury brought against a physician, a committee's records shall be discoverable.
 
 
 61
 N.H. Rev. Stat. Ann. ch. 151:13-a II. The New Hampshire Supreme Court carefully delineated the scope of the statute in a case that was the opening chapter to the case before us. The parties were the same; the issue concerned only the scope of the statute. Justice Souter, then an associate justice of the New Hampshire Supreme Court, wrote the opinion, In re "K", 561 A.2d 1063 (N.H. 1989). In the state case the evidence was clear that Nurse Watkins made an investigation as to the source of plaintiff's infection, then made a report to the Infections Committee and prepared a written report which was kept in files in her own office. Plaintiff's lawyer requested the hospital, through Nurse Watkins, to release the results of the investigation. The hospital refused, claiming a privilege under N.H. Rev. Stat. Ann. 151:13-a. Plaintiff then brought a petition in the New Hampshire Superior Court seeking a disclosure order. The superior court held the privilege inapplicable and ordered disclosure of Nurse Watkins' written report and the relevant portion of the minutes of the meeting of the Infections Committee at which Nurse Watkins made her report. The hospital appealed. Id. at 1065. After a lengthy explanation and discussion of the legislation, the New Hampshire Supreme Court held that the minutes of the Infection Committee meeting and Nurse Watkins' written report were insulated from disclosure by the New Hampshire statute. Id. at 1065. The court also held:
 
 
 62
 Once, however, it is understood that the requisite committee structure and quality review function are present, our traditionally limiting approach to privilege claims must be honored by recognizing that the privilege does not go beyond the records of testimony, as such, to which the statute refers. As we observed before, a quality assurance committee's attention does not place its subject matter beyond the bounds of discovery or disclosure in the normal course; the privilege is confined to the records and testimony described in the statute. See N.H.S. Jour. 1410-14 (1981). Thus, the ordinary record of a patient's treatment remains admissible as it always has been, even though a quality assurance committee may have studied that record and issued a report based on data culled from it. And a physician may still be obligated to testify about the course of a patient's case, and to render a professional evaluation of the treatment, even though a quality assurance committee may already have elicited the same testimony on the same subject in the course of its own proceedings.
 
 
 63
 Id. at 1070.
 
 
 64
 We have no difficulty finding that the New Hampshire statute was not implicated by the direct examination of Nurse Watkins in the case at bar. It was arguably implicated by defendants' cross-examination, but that is not an issue before us. It is incredible to us that defendants would misstate in their argument the questions asked and the testimony given, fail to object at trial to questions and answers which they now claim led to a violation of the statute, deliberately implicate the statute on cross-examination, and still appeal the issue. This not only transcends the proper limit of appellate argument, it requires a good measure of "chutzpa."
 
 III.
 THE CLOSING ARGUMENT
 
 65
 At the close of his argument, plaintiff's counsel stated:
 
 
 66
 I gave a figure to you in the opening, that I would suggest that you seriously consider as a full, fair, adequate and reasonable compensation for what they have suffered, what they are suffering and what they will suffer. And as I promised you then, I will say it again now.
 
 
 67
 I think I would suggest to you-not I think. What I think doesn't count. I would suggest to you that on the evidence, one million five hundred thousand dollars for Kimberly and one million five hundred thousand dollars for John is adequate, fair, full and complete compensation for their interests.
 
 
 68
 In Davis v. Browning-Ferris Industries, Inc., 898 F.2d 836 (1st Cir. 1990), we held that, even in a diversity case, the question of whether the amount of the ad damnum can be disclosed to the jury is a matter of procedure and therefore federal law applies. Id. at 837. We went on to hold that such disclosure was improper. Id. at 837-38.
 
 
 69
 Inexplicably, both parties addressed the question below as exclusively one of New Hampshire law and, unfortunately, persuaded the district judge, a visiting judge from Pennsylvania, that New Hampshire law controlled. Just prior to final argument defense counsel asked the court that it preclude plaintiff's counsel from expressing his opinion about the dollar value of the case or referring to the ad damnum in his argument. Plaintiff's counsel had, without objection, stated the amount of the ad damnum in his opening. The court therefore asked: "You mean it's all right on opening statement but not on closing?" Defense counsel stated: "If I knew he was going to say it on opening, I would have objected but rather than my saying anything and object and make a bigger deal about it, I made the judgment not to." The judge stated, after plaintiff's counsel argued that under New Hampshire law reference to the ad damnum was allowed:
 
 
 70
 THE COURT: Coming from the Common-wealth of Pennsylvania my ears stood straight up when I heard you mention the figures in your opening statement, but hearing no objection I assumed that probably was the practice in this jurisdiction.
 
 
 71
 The court then asked plaintiff's counsel to supply him with authority for his position.
 
 
 72
 The court's observation illustrates why counsel should object at the time an incorrect statement is made by opposing counsel. If an objection had been made to the ad damnum disclosure in the opening, there would have been time for some research by the court and counsel prior to closing argument, and it probably would have been ascertained that there was a First Circuit case that clearly controlled. As it was, the court did not make a ruling until after defendants' argument. It ruled that under New Hampshire law the ad damnum could be disclosed to the jury in final argument.
 
 
 73
 We are faced, therefore, with a ruling based on the wrong law. This was due primarily to the neglect of both counsel. We would think that counsel would be aware of the controlling First Circuit cases by the time of trial. That plain error was committed is clear, but it is also clear that the error was harmless. The ad damnum was in the amount of one million five hundred dollars for each plaintiff. The jury awarded plaintiff one hundred and twenty-five thousand dollars and her husband twenty-five thousand dollars. Clearly, the jury paid scant attention to the amount of the ad damnum. Under the circumstances, there is no point in sending the case back for a new trial.
 
 CONCLUSION
 
 74
 The judgment below is affirmed. Appellees are awarded costs of appeal.
 
 
 
 *of the Eastern District of Pennsylvania, sitting by designation.
 
 
 [1]
 Plaintiff and her husband had moved from New Hampshire to another state before this action, based on diversity jurisdiction, was brought
 
 
 [2]
 This is the case name of the patient, not her actual name
 
 
 [3]
 Rule 103. Rulings on Evidence
 (a) Effect of erroneous ruling. Error may not be predicated upon a ruling which admits or excludes evidence unless a substantial right of the party is affected, and
 (1) Objection. In case the ruling is one admitting evidence, a timely objection or motion to strike appears of record, stating the specific ground of objection, if the specific ground was not apparent from the context;